# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 03-40142-JAR |
| ) | |
| ) | |
| DAVID C. WITTIG and ) | |
| DOUGLAS T. LAKE, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Douglas Lake's fifth Motion for subpoena issued pursuant to Fed. R. Crim. P. 17(c) (Doc. 909). The government has filed a Response in Opposition (Doc. 912). The Court has considered the submissions of the parties and is now prepared to rule. For reasons set forth in detail below, defendant's motion is granted in part and denied in part.

The Court has entered two Orders denying defendant's previous Rule 17(c) motions (Docs. 878 and 929), ruling that defendant did not meet the test for issuance of such subpoenas as set forth by the Supreme Court in *United States v. Nixon*.[1] Those Orders summarized the *Nixon* test, which sets forth the moving party's burden as clearing the three hurdles of relevancy, admissibility and specificity.[2] The Court also ruled that the government has standing to object to the issuance of Rule 17(c) motions, although it does not have standing to move to quash any

---

[1] 418 U.S. 683, 700 (1974).

[2] *Id.*

subpoena issued pursuant to that rule.[3] On June 24, 2008, the Court granted in part and denied in part defendant's fourth Rule 17(c) motion seeking records and documents from Westar Energy, Inc.[4] The Court will not restate the text of its analysis in its entirety, but instead incorporates the Orders by reference and relies on them as necessary in ruling on the instant motion.

On May 15, 2008, defendant filed the instant motion pursuant to Rule 17(c) (Doc. 909) requesting the Court permit defendant to issue subpoenas *duces tecum* to (1) Westar Energy, Inc. ("Westar" or "the Company") and Protection One, for D & O Questionnaires for the years 2000 and 2001 for Richard Ginsburg and Darius Nevin; (2) Westar, for documents indicating payments by Westar in connection with the establishment and maintenance of a home office at Lake's residence in Bronxville, New York during his 4-year employment at Westar; (3) Westar, to obtain a tax settlement agreement of the kind described in Westar's Annual Report; (4) John W. Meara, for billing records and non-privileged communications between Meara and any of the following: the United States Attorney's Office for the District of Kansas, the Federal Bureau of Investigation, or Western Resources/Westar Energy or its representatives, in connection with the investigation or prosecution of defendants, and all documents and other materials used to prepare for testimony; records of any and all payments to Meara in connection with his testimony or preparation for testimony; and records of any and all payments to Meara in connection with *United States v. Miller*, Case No. 06-40151-JAR; and (5) James Zakoura, for billing records and communications between Zakoura and any of the following: the United States Attorney's Office for the District of Kansas, the Federal Bureau of Investigation, or Western Resources/Westar

---

[3](Doc. 929.)

[4](Doc. 932.)

Energy or its representatives, in connection with the investigation or prosecution of this case, from September 1998 through December 2002, and his Westar D & O questionnaire for 2002. The Court will address each request in turn.

### 1. Ginsburg and Nevin D & O Questionnaires

In 2001, Richard Ginsburg was Chief Executive Officer and Darius Nevin was Chief Financial Officer of Protection One, a company acquired by Western Resources. As part of their respective duties and responsibilities, Ginsburg and Nevin traveled extensively from Protection One's headquarters in Florida to Topeka, Kansas and other locations around the country. In their roles, each was required to complete director and officer questionnaires for Protection One as well as for Western Resources/Westar. Defendants concede that they have been supplied with the vast majority of questionnaires, except the following: Ginsburg's Protection One D & O for the years 2000 and 2001, and his Westar D & O Questionnaire for 2002; and Nevin's Protection One D & O Questionnaires for 2000 and 2001, and his Westar D & O Questionnaire for 2002.

Defendant asserts that these records are relevant and evidentiary because they go directly to the defendants' defenses, by illustrating certain business practices in existence at Westar and Protection One during the relevant time period, and by tending to demonstrate the level and breadth of information and knowledge regarding the D&O Questionnaires, an issue directly relevant to the defendant's intent at the time. This subpoena will serve to supply the missing D&O Questionnaires not previously produced by the Government.

The government contends that no such records exist. Because Ginsburg and Nevin started with Protection One in April and August 2001 respectively (as testified at trial), neither one filled out the questionnaires for 2000 or 2001, as they would have been distributed and filled

out in February-March 2001 in advance of the proxy filing in April-May 2001. Neither Ginsburg or Nevin were officers or directors of Westar and thus never filled out D & O questionnaires for Westar.

Defendant's request is granted with respect to this category of documents. Either the requested D & O Questionnaires exist or they do not exist, and Westar can respond accordingly.

> 2.  **Documents indicating expenditure payments of telephone and/or Internet services paid by Westar for Mr. Lake's home office located at 29 Sturgis Road, Bronxville, NY 10708**

Defendants request certain documents indicating payments by Westar in connection with the establishment and maintenance of a home office at Lake's residence in Bronxville, New York during his employment at Westar. Specifically, the subpoena seeks records of payments by Westar for setting up the office, for telephone use and for Internet or other wire-based services from September 1998 through December 2002. These requested documents show the extent of Lake's work for Westar from his New York home office, illustrate Westar's acknowledgment that Lake's duties and responsibilities were appropriately undertaken in New York, support the terms upon which Lake entered into employment with Westar, and demonstrate that Lake did not have an obligation to sell his New York residence.

The government responds that defendants received these records as part of the discovery in the arbitration that were bates-stamped, and include Lake's expense reports on which he sought reimbursement for payment of the internet service.[5] Thus, this request fails the *Nixon* hurdle because such records "are not otherwise procurable reasonably in advance of trial by

---

[5]*(See, e.g.*, WE083652-53 showing the request for payment of DSL line signed by Lake and approved by Wittig.)

4

exercise of due diligence."[6]

Defendant's request for this category of documents is denied, as the records have already been provided.

### 3. Internal Revenue Service Settlement Agreement with Westar, as Discussed in Westar's Annual Report, 2007 Form 10-K

Defendant asserts that in the prior two trials, the prosecution developed considerable testimonial and documentary evidence concerning Westar's tax treatment of the personal use of corporate aircraft by the defendants and others, including evidence that the government argued showed that the company was "doing it wrong" and that the defendants "refused to do it right" from both tax and SEC perspectives. It is defendants' position that evidence related to the tax treatment of aircraft use is irrelevant to the remaining charges in the Indictment in light of the opinion of the Tenth Circuit.[7] Nevertheless, because the defendants anticipate that the government will again offer such evidence and because they cannot predict how the Court may rule on the issue, defendants assert they must prepare to address the matter at trial.

Included in the evidence admitted at the second trial was testimony from Carl Koupal that he had been advised by Mr. Stadler, Westar's tax director, that the IRS had audited Westar and that the tax treatment of personal aircraft use had not been raised as an issue. Defendant argues that this testimony tends to exculpate the defendants because it supports their claim that revision of the Company's tax treatment of the planes was not mandatory, as the government contends, and that the methodology adopted by the Company and perpetuated by Wittig was accepted by the IRS.

---

[6]*United States v. Nixon*, 418 U.S. 683, 699-700 (1974).

[7]*See United States v. Lake*, 472 F.3d 1247 (10th Cir. 2007).

On February 29, 2008, Westar released its Annual Report, Form 10-K, for the year 2007. In that Report, it disclosed the following:

> The IRS has examined our Federal income tax returns for the years 1995 through 2002. We reached a tentative settlement with the IRS Office of Appeals (IRS Appeals Settlement) in December 2007. The principal issues related to the method for capitalizing and allocating overhead costs, the carry back of capital losses and net operating losses and the deduction of and credit for research and development costs. The IRS Appeals Settlement was approved by the Joint Committee on Taxation and accepted by the IRS in February 2008. As a result, we will receive a tax refund of approximately $18.8 million, excluding interest.[8]

The audit period covered by this announcement covers the entire period during which both Wittig and Lake were employed by Westar. Regardless of the resolution of the personal use of the aircraft issue, defendant argues that the information is relevant to the defendants' case. If, as it appears from the description of the Settlement Agreement, the IRS declined to challenge Westar's tax treatment of the personal use of corporate aircraft, that fact would support defendant's position that a revision of that treatment was not mandatory as the government asserts. It is possible that the plane issue was addressed in the tax settlement but is not among the "principal issues" discussed in the Form 10-K. If so, the manner in which the plane issue was addressed for tax purposes is nevertheless relevant and may assist the defendants in preparing their defense. Defendant asserts that because tax settlement agreements are not matters of public information, the IRS is prohibited by statute from disclosing "tax return information" to persons other than taxpayers except in statutorily-defined circumstances. Accordingly, Defendants have no means for obtaining this information other than a subpoena

---

[8](Westar 2007 Annual Report, at 57.)

upon Westar.

The government responds that this request is based purely on speculation and constitutes the classic fishing expedition.

Defendant's request for this category of documents is denied. The referenced testimony of Carl Koupal that *he had been advised by Mr. Stadler, Westar's tax director, that the IRS had audited Westar and that the tax treatment of personal aircraft use had not been raised as an issue,* is taken somewhat out of context. The evidence at trial at least suggested that the IRS would not have looked at personal use of aircraft, because there was no such use disclosed on the D& O Questionnaires. Furthermore, the scope of the audit is described as : The principal issues related to the method for capitalizing and allocating overhead costs, the carry back of capital losses and net operating losses and the deduction of and credit for research and development costs. There is no indication that personal use of aircraft was within the scope of the audit. Thus, it would appear that the subpoena is based on mere speculation and does constitute a fishing expedition.

> **4.** **Billing records and non-privileged communications between John W. Meara and any of the following: the U.S. Attorney's Office for the District of Kansas, the Federal Bureau of Investigation, or Western Resources/Westar Energy or its representatives, in connection with the investigation or prosecution of Defendants, and all documents and other materials used to prepare for testimony; records of any and all payments to John W. Meara in connection with his testimony or preparation for testimony; and records of any and all payments to John Meara in connection with *United States v. F. Jeffrey Miller*, Case No. 5:06-CR-40151-JAR**

The government has designated Meara as an expert witness in this case, and he will therefore be subject to cross examination regarding, among other things, the extent of his work for the United States Attorney in this and other cases, the amount of money the government

has paid him for his testimony, the extent of his role in the case, both pre- and post-indictment, his relationship with the Untied States Attorney's Office and in particular, his role in *United States v. Jeffrey Miller*, a case in which he executed at least two Monitoring Agreements; one pursuant to a June 27, 2006 order of the Court and a second, "revised business monitoring agreement," pursuant to a December 22, 2007 order of the Court. Defendant contends that Meara was appointed by the Court on the suggestion of Government counsel, and those agreements were ordered and remain under seal. As of July 2007, just over a year after the first order, Mr. Meara had been paid $301,498 pursuant to the Monitoring Agreements. As Meara's relationship with the United States Attorney's Office for the District of Kansas is a continuing one, information about the relationship is highly probative of his inclination to maintain the relationship by mollifying the prosecutor. In his role as an expert witness, the relationship becomes even more relevant. Defendant asserts that it would use the communications sought for impeachment purposes as well as to reveal other, inconsistent theories of prosecution in this case, including the names of other potential targets or subjects.

The government raises several objections to this request. First, pretrial discovery of expert witnesses, their credentials and their opinions and the basis for those opinions is governed by Fed. R. Crim. P. 16(a)(1)(G) and (b)(1)(C), as incorporated into this Court's General Order of Discovery and Scheduling.[9] Second, the misrepresentations of defendant "broach on the sanctionable." The suggestion that Meara was appointed as Monitor in the *Miller* case "on the suggestion of Government counsel" is patently false. The suggestion was first broached by Miller's attorney, Pete Smith, who had retained Meara's firm previously on other matters, and

---

[9](Doc. 18.)

the government only approved the form of the agreement and is not aware of what the Meara firm has been paid by Miller. Third, the implication that the government sought that the agreement be placed under seal is unfounded. It was placed under seal on Magistrate Judge Sebelius's order, presumably because it contained bank account and other sensitive information. Finally, the government invites the defense to attempt to establish this theory of impeachment which, in the end, will result in bolstering Meara's credentials.

Defendant's request for this category of documents is denied, as it is based on speculation and/or misrepresentation of Meara's relationship with the government and the circumstances of his retention in an unrelated case. Moreover, as the Court previously stated, prior to trial, impeachment materials generally may not be obtained through a Rule 17(c) subpoena because such materials fail *Nixon's* admissibility requirement.[10] As defendant points out, some courts have concluded that when a person is almost certain to testify as a witness at trial and there is an indication of what that testimony will be, then pre-trial production is appropriate.[11] But, as defendant also points out, impeachment evidence only ripens into admissible evidence after the witness has presented direct testimony at trial.[12] Nevertheless, the fact that the requested documents *might* be admissible cannot overcome the Court's ruling on specificity.

### 5. Billing records and communications between James Zakoura and any

---

[10]*Nixon*, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require production in advance of trial.").

[11]*See United States v. Libby*, 432 F. Supp. 2d 26, 36 (D.D.C. 2006) (citing *United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988)) (concluding that it was proper to disclose impeachment evidence before trial pursuant to a Rule 17(c) subpoena because the "putative key witness, whose general testimony is already known, is scheduled to testify").

[12]*Id*. (citing *United States v. Cuthbertson*, 630 F.2d 139, 145-46 (3d Cir. 1980)).

> **of the following: the United States Attorney's Office for the District of Kansas, the Federal Bureau of Investigation, or Western Resources/Westar Energy or its representatives, in connection with the investigation or prosecution of this case**

Zakoura has twice testified at the trial of this case and likely will at the third trial. The requested documents or the absence of them would be probative of impeachable bias in this case and are illustrative of Zakoura's involvement in the case. Defendants are unable to procure these records without the Rule 17(c) subpoenas. These documents are not in the public domain and are only available by Westar. Were the defendants to simply issue the subpoena *duces tecum* for trial, there would be little or no time to review, analyze and make the best possible use of the documents prior to either direct or cross examination of witnesses. Further, the documents sought may give rise to pretrial motions addressing issues relevant to the admissibility of evidence, and the cross examination of government witnesses pursuant to Fed. R. Evid. 613.

The government responds that "[t]his request constitutes possibly the most egregious misuse of Rule 17(c) by the defendants to date." Defendants know from Zakoura's testimony in the two previous trials that he was testifying as a percipient witness under subpoena. There have been no payments to Zakoura by the government, FBI, Westar or anyone else in exchange for his testimony, and he so testified at trial. In addition, defendants are already in possession of those documents Zakoura used to prepare for testimony, being the exhibits he was shown during trial, and communications he made to the United States Attorney's Office.[13]

Defendant's request for this category of documents is denied. Based on Zakoura's prior testimony at the two previous trials, he was not retained or compensated by the government.

---

[13](Doc. 730, 1-149, Hearing Concerning Jencks Act Materials.)

Rather, he contacted the government in his role as representative of a watchdog group of utility users. Further, defendant has obtained discovery and possession of the items described by the government in its response.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's fifth Motion Pursuant to rule 17(c) (Doc. 909) is GRANTED in part and DENIED in part, as set forth above. The Court authorizes the issuance of subpoenas *duces tecum* to the Custodian of Records for Westar Energy, Inc. and Protection One calling for production of the documents as specified herein.

**IT IS SO ORDERED.**

Dated this 16th day of July 2008.

    S/ Julie A. Robinson
    Julie A. Robinson
    United States District Judge